By Fax

1  PAUL L. GALE (SBN 65873)
   paul.gale@troutmansanders.com
2  JEREMY A. RHYNE (SBN 217378)
   jeremy.rhyne @troutmansanders.com
3  TROUTMAN SANDERS LLP
   5 Park Plaza, Suite 1400
4  Irvine, CA 92614-2545
   Telephone:     949.622.2700
5  Facsimile:     949.622.2739

6  Attorneys for Plaintiff
   ITALIA MARITTIMA, S.P.A.
7

8          UNITED STATES DISTRICT COURT

9          NORTHERN DISTRICT OF CALIFORNIA

10             SAN FRANCISCO DIVISION

11

12 ITALIA MARITTIMA, S.P.A., an Italian      Case No.
   Company,
13                                           **CV 10    803**
              Plaintiff,
14                                           **COMPLAINT FOR:**
   v.
15                                           **(1) BREACH OF CONTRACT AGAINST
   SEASIDE TRANSPORTATION                        SEASIDE TRANSPORTATION
16 SERVICES, LLC, A Delaware Limited             SERVICES, LLC**
   Liability Company; MARINE
17 TERMINALS CORPORATION, A                  **(2) BREACH OF CONTRACT AGAINST
   Nevada Corporation; and                       MARINE TERMINALS
18 TRICOR SERVICES, LLC, A Delaware             CORPORATION AND TRICOR
   Limited Liability Company,                    SERVICES, LLC**
19
              Defendants.                     **(3) NEGLIGENCE AGAINST ALL
20                                               DEFENDANTS**

21

22

23

24

25

26

27

28

   COMPLAINT                                                    1033220V1

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545



FILED
2010 FEB 25  P 3: 15
RICHARD W. WIEKING
U.S. DISTRICT COURT
NO. DIST. OF CALIFORNIA

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1     Plaintiff Italia Marittima, S.p.A., brings this action against Seaside Transportation

2 Services, LLC, Marine Terminals Corporation, and Tricor Services, LLC.

3

4 **JURISDICTION**

5     1.    This case concerns a breach of a maritime contract and a tort committed upon the

6 navigable waters of the United States. This Complaint asserts admiralty claims within the

7 meaning of Rule 9(h) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1333.

8

9     2.    Jurisdiction of this Court is proper pursuant to Article III, Section 2, Clause 1 of

10 the Constitution of the United States, and under 28 U.S.C. § 1333(1).

11

12     3.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because it is the

13 District in which a substantial part of the events giving rise to the claims occurred.

14

15 **PARTIES**

16     4.    Plaintiff Italia Marittima, S.p.A. ("Italia Marittima") is an Italian ocean carrier

17 whose principal place of business is Trieste, Italy. Italia Marittima was formerly known as Lloyd

18 Triestino Di Navigazione S.p.A.

19

20     5.    Seaside Transportation Services, LLC ("STS") is a Delaware limited liability

21 company doing business in California. STS is an assignee of a Terminal Agreement between

22 Italia Marittima and MTC.

23

24     6.    Marine Terminals Corporation ("MTC") is a Nevada corporation doing business in

25 California. MTC performed stevedoring services at Ben E. Nutter Terminal in the Port of

26 Oakland, California.

27

28

COMPLAINT                 - 1 -                               1033220V1

1 · 7. Tricor Services, LLC ("Tricor") is a Delaware limited liability company doing

2 business in California. Tricor entered into a contract with STS to provide stowage services on

3 behalf of STS.

4

5 **FACTUAL ALLEGATIONS**

6 8. Pursuant to the terms of a "Boxtime" Charter Party dated February 27, 2003, Yang

7 Ming Marine Transport Corp. time chartered the M/V MED TAIPEI (the "Vessel") to Italia

8 Marittima.

9

10 9. The terms of the time charter required Italia Marittima to provide stevedoring

11 services, to include stowage planning and the loading and securing of containers on the Vessel.

12

13 10. On May 15, 2001, Italia Marittima entered into an Agreement for Stevedoring and

14 Terminal Services ("Terminal Agreement") with MTC for services at the Port of Oakland,

15 California. The Terminal Agreement required MTC to perform stevedoring services "in an

16 efficient, prudent, economical and workman-like manner in accordance with sound operating

17 practices," to "plan unloading/loading sequence of containers in accordance with the inbound

18 stowage sheet and the pre-stow instructions of [Italia Marittima] and prepare and furnish to [Italia

19 Marittima] appropriate container stowage plans," and to "load and stow container/cargo onto

20 vessels" and to "lash and unlash containers stowed on or under deck of vessels." A true and

21 complete copy of the Terminal Agreement, as amended, is attached as Exhibit A. The Terminal

22 Agreement also included an arbitration clause.

23

24 11. Effective August 2, 2003, the Terminal Agreement was assigned by MTC to STS.

25 STS assumed all of the duties of MTC under the Terminal Agreement. A true and complete copy

26 of this assignment is attached as Exhibit B. Italia Marittima and STS have agreed to waive and

27 void the arbitration clause in the Terminal Agreement.

28

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

COMPLAINT - 2 - 1033220V1

12. On or about August 2, 2003, STS and Tricor entered into an "Operation Support Services Agreement" in which Tricor agreed to provide vessel stowage services to STS for the benefit of STS and its clients, including the creation of loading plans, and the monitoring of the Vessel during operation to make any necessary changes. On or about February 24, 2004, the Vessel called the Port of Oakland to load and discharge cargo. Pursuant to the Terminal Agreement, STS, as assignee, was to provide stowage planning and stevedoring services to the Vessel.

13. STS contracted with MTC to perform stevedoring services to the Vessel at Oakland.

14. The contracts between STS and MTC and between MTC and Tricor contain implied or express warranties of workmanlike performance, which required MTC and Tricor to perform their duties with reasonable care, skill and diligence.

15. Italia Marittima was a third party beneficiary of both the contract between STS and MTC and the contract between MTC and Tricor.

16. The Vessel was a standard container vessel of her type, of a kind well known in the industry and well known to STS, MTC and Tricor.

17. By the time STS, MTC and Tricor performed planning and stowage work for the Vessel in February 2004, MTC and Tricor had previously loaded and prepared stowage plans for the Vessel on several occasions during the preceding 10 months. MTC and Tricor, therefore, were, or should have been, familiar with the Vessel.

18. On the Vessel, like all standard container vessels, containers are loaded in "cells" or slots within the vessel or on deck. The "cell location" on the vessel is designated by a six

COMPLAINT                                    - 3 -                                    1033220V1

figure code that is broken into 3 pairs of numbers locating the container fore, aft and athwart ships from the centerline and vertically from the tank top in the hold, or above the deck hatch lid. Each athwart ship row of containers is called a "bay." The spaces in which vertical columns of containers are stacked are described as "rows." Horizontal layers of containers are known as "tiers." A container's cell position on deck is therefore defined by bay-row-tier.

19.     Stevedores at Ningbo, Zhejiang China had loaded containers in Bay 42 at rows 02-11. The heaviest of those of the containers which were stowed at tiers 4 or 5 weighed 8.2 tons. At Oakland, 15 containers were loaded in Bay 42 between rows 06 and 12. These rows included three containers in the fourth-tier that weighed over 20 tons and containers in the fifth tier of rows 20, 00 and 01 of 6.8, 6.8 tons and 8.2 tons respectively. The heaviest fourth-tier container weighed over 25 tons. Row 04 was left empty, even though the three heavy fourth-tier containers could have been stowed in that empty row or at some other place on the Vessel rather than the fourth tier.

20.     Similarly, in Bay 46, stevedores at Shanghai, China had loaded a number of containers at rows 05-11, including four fourth-tier containers weighing from 6.8 tons to 8.6 tons.

21.     MTC loaded another 27 containers in Bay 46 between rows 01 and 12. This section of containers included three fourth-tier containers weighing more than 24 tons. Row 03 was left empty. The three heavy containers loaded in the fourth-tier on rows 01, 00, and 02 could easily have been stacked three high in row 03, which was left empty.

22.     MTC used stowage plans prepared by Tricor.

23.     On February 25, 2004, the Vessel sailed from Oakland en route to Long Beach, California with 1,314 containers on board.

COMPLAINT                                    - 4 -                                    1033220V1

24. On February 26, 2004, the Vessel encountered heavy weather. Because certain container stacks at Bays 42 and 46 on deck were overloaded and improperly secured, these container stacks collapsed. This caused some containers to fall into the Pacific Ocean and damaged some of the containers that did not fall in the ocean. In addition, the Vessel was damaged.

25. STS and MTC, in accordance with Tricor's stowage plans, overloaded the container stacks at Bays 42 and 46 by (i) exceeding maximum tier allowances in the upper tier; (ii) loading stacks in excess of the designated stack weight limits; and (iii) stowing containers with a vertical weight distribution likely to subject the containers and securing / lashing equipment to forces in excess of the maximum allowable forces under the applicable Class (ABS) rules. In addition, STS and MTC failed properly to lock twist locks and properly to adjust lashing equipment.

26. STS and MTC implemented improper stowage plans prepared by Tricor even though it knew or should have known that the stowage configuration was probably unsafe and likely to violate industry standards for safe stowage of containers.

27. The loss of and damage to the containers, and damage to the Vessel, were caused by the negligent failure of STS, MTC and Tricor to prepare and execute a proper stowage plan and to properly load and secure the containers on the Vessel.

28. On June 9, 2004, an underwater research vehicle conducting a seafloor survey in Monterey Bay, California discovered a 40-foot container (#TGHU771226-2) resting on the seafloor at a depth of 1281 meters within the boundaries of the Monterey Bay Marine Sanctuary. The container was one of the containers aboard the Vessel that was lost overboard as a result of the collapse of container stacks at Bay 46 on February 26, 2004.

COMPLAINT                                    - 5 -                                    1033220V1

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1    29.    Because the container was in the Sanctuary, the National Oceanographic and

2    Atmospheric Administration ("NOAA") claimed damages, including environmental remediation

3    and civil penalties pursuant to the National Marine Sanctuaries Act, 16 U.S.C. § 1341 *et seq.*

4    ("the Act"). NOAA also threatened to require removal of all fifteen of the containers lost within

5    the Sanctuary (the "NOAA Claim").

6

7    30.    STS, MTC, and Tricor were aware, or should have been aware, that the Vessel

8    would traverse within the boundaries of the Monterey Bay Sanctuary and that the loss of any

9    containers would result in damages and civil penalties pursuant to the Act.

10

11    31.    The container found by NOAA was loaded at Shanghai in Bay 46, row 07, in the

12    3rd tier. The container reportedly weighed 14.4 tons and contained passenger car tires.

13

14    32.    NOAA's experts calculated that provable damages, including environmental "loss

15    of services" was valued at approximately $12,000,000. In addition, NOAA asserted an

16    entitlement, in addition to the claim for damages, to levy a fine on Italia Marittima and Yang

17    Ming of up to $119,000 per day for the fifteen containers.

18

19    33.    Italia Marittima and Yang Ming jointly settled the NOAA Claim for payment of

20    $3,250,000 (the "NOAA Settlement"). This payment was in settlement of both the claim for

21    damages and civil penalties. A Consent Decree memorializing the settlement was entered by the

22    United States District Court for the Northern District of California on September 26, 2006.

23

24    34.    Italia Marittima has suffered damages in an amount exceeding $7,000,000. These

25    damages include the NOAA Settlement, cost and expenses incurred in connection with the

26    NOAA Settlement, expenses of an arbitration brought by Yang Ming, settlement of cargo claims,

27    losses arising out of the loss of the containers, and potential liability to Yang Ming for damage to

28    the Vessel.

COMPLAINT                                    - 6 -                                    1033220V1

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1    35.    Italia Marittima's damages were directly and proximately caused by the acts and

2    omissions of STS, MTC, and Tricor.

3

4                              **FIRST CLAIM FOR RELIEF**

5                        **BREACH OF CONTRACT AGAINST STS**

6    36.    The allegations of Paragraphs 1 through 35 above are repeated and incorporated by

7    reference as if fully set forth herein.

8

9    37.    The Terminal Agreement required STS to perform stevedoring services "in an

10   efficient, prudent, economical and workman-like manner in accordance with sound operating

11   practices."

12

13   38.    STS is wholly responsible for the actions of MTC, its subcontractor, and failed to

14   perform the services under the Terminal Agreement in a workmanlike manner in breach of that

15   Agreement.

16

17   39.    STS's breach of the Terminal Agreement caused Italia Marittima to suffer the

18   damages set forth in Paragraph 34.

19

20   40.    Because of STS's breach of the Terminal Agreement, STS is liable to Italia

21   Marittima for damages in an amount exceeding $7,000,000.

22

23                              **SECOND CLAIM FOR RELIEF**

24                **BREACH OF CONTRACT AGAINST MTC AND TRICOR**

25   41.    The allegations of Paragraphs 1 through 40 above are repeated and incorporated by

26   reference as if fully set forth herein.

27

28

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1  42.  Italia Marittima was a third party beneficiary of the contract between STS and

2  MTC and the contract between MTC and Tricor.

3

4  43.  MTC breached the contract between STS and MTC by failing to perform its work

5  with reasonable care, skill and diligence, thus breaching express contractual duties as well as an

6  implied warranty of workmanlike performance.

7

8  44.  Tricor breached the contract between MTC and Tricor by failing to perform its

9  work with reasonable care, skill and diligence, thus breaching express contractual duties as well

10  as an implied warranty of workmanlike performance.

11

12  45.  These breaches by MTC and Tricor caused Italia Marittima to suffer the damages

13  set forth in Paragraph 34.

14

15  46.  MTC and Tricor are liable to Italia Marittima for damages in an amount exceeding

16  $7,000,000.

17

18  **THIRD CLAIM FOR RELIEF**

19  **NEGLIGENCE AGAINST STS, MTC AND TRICOR**

20  47.  The allegations of Paragraphs 1 through 46 above are repeated and incorporated by

21  reference as if fully set forth herein.

22

23  48.  STS, MTC, and Tricor each had a duty not to negligently damage Italia Marittima.

24

25  49.  STS, MTC, and Tricor each breached their tort duties of reasonable care owed to

26  Italia Marittima.

27

28

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

COMPLAINT                          - 8 -                          1033220V1

50.     The negligence of STS, MTC, and Tricor was the proximate cause of the damages set forth in paragraph 34 above.

51.     STS, MTC, and Tricor are each liable to Italia Marittima, jointly and severally, for damages in the amount exceeding $7,000,000.

## PRAYER FOR RELIEF

**WHEREFORE,** Italia Marittima, S.p.A respectfully requests that the Court enter judgment against Seaside Transportation Services, LLC, Marine Terminals Corporation, and Tricor Services, LLC as follows:

1.     That the Court enter judgment in favor of Italia Marittima, S.p.A. and against Seaside Transportation Services, LLC, Marine Terminals Corporation, and Tricor Services, LLC, in an amount exceeding $7,000,000, and for prejudgment interest;

2.     Awarding Italia Marittima, S.p.A. such other and further relief as the Court deems just and equitable.

Dated:     February 25, 2010                    TROUTMAN SANDERS LLP

By: _____
    Paul L. Gale
    Jeremy A. Rhyne

    *Attorneys for Plaintiff*
    *ITALIA MARITTIMA, S.P.A.*

COMPLAINT                              - 9 -                              1033220V1

TROUTMAN SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

# EXHIBIT A



# LLOYD TRIESTINO di NAVIGAZIONE SPA

# STEVEDORING AND TERMINAL SERVICE AGREEMENT

# OAKLAND

**May 15, 2001**

## ORIGINAL

EX. A, PAGE 10

## AGREEMENT FOR STEVEDORING AND TERMINAL SERVICES
### BETWEEN
## LLOYD TRIESTINO di NAVIGAZIONE SPA
### AND
## MARINE TERMINALS CORP.

THIS AGREEMENT is made and entered into on May 15, 2001 between LLOYD TRIESTINO di NAVIGAZIONE SPA (hereinafter referred to as LLOYD TRIESTINO or CARRIER), an ocean common carrier, and Marine Terminals Corporation (hereinafter called MTC or CONTRACTOR).

### WITNESSETH

WHEREAS, LLOYD TRIESTINO has entered into a vessel sharing agreement with Evergreen Marine Corporation (Taiwan) that provides for LLOYD TRIESTINO cargo to be carried on LLOYD TRIESTINO vessels and for Evergreen cargo to be carried on LLOYD TRIESTINO vessels, and

WHEREAS, MTC operates a Marine Container Terminal designated as the Ben E. Nutter Terminal in the Port of Oakland, CA., (hereinafter referred to as Terminal), pursuant to FMC Agreement No: 224-200870, and

WHEREAS, MTC is ready and able to perform the services detailed in this Agreement for LLOYD TRIESTINO's operations at the Terminal, and

WHEREAS, LLOYD TRIESTINO desires to utilize the Terminal and the services of the MTC for handling of containerized and other cargo in the Port of Oakland, and

WHEREAS, LLOYD TRIESTINO and MTC desire to enter into a relationship that satisfies CARRIER'S long term facility needs in Oakland, now therefore:

### SECTION 1        AGREEMENT TO PROVIDE AND OBTAIN SERVICES

MTC agrees to provide and LLOYD TRIESTINO agrees to obtain stevedoring and terminal services in accordance with the terms and conditions hereinafter specified.

### SECTION 2        TERM

This Agreement shall be effective as of the arrival of the first LLOYD TRIESTINO vessel at the Ben E. Nutter Terminal (BENT) in Oakland and shall continue in effect until June 30, 2002. Thereafter, this Agreement shall continue in full force and effect unless and until it is canceled at any time after the initial term upon ninety (90) days written notice by either party.

EX. A, PAGE 11

### SECTION 3          MTC'S SERVICES AND OBLIGATIONS

#### 3.1   GENERAL OBLIGATIONS

A.     MTC, as an independent Contractor and not as an agent or employee of LLOYD TRIESTINO, shall perform the services set forth in this Agreement in an efficient, prudent, economical and workman-like manner in accordance with sound operating practices and LLOYD TRIESTINO's current procedures as may be transmitted to the MTC in writing from time to time.

B.     MTC shall perform all services in accordance with the ILWU/PMA collective bargaining agreement, MTC's labor agreement with the IAM  and the customs and practices of the Port.

#### 3.2   BERTH PRIORITY

A.     MTC will provide LLOYD TRIESTINO with fixed day of the week Priority Berthing Period(s) each consisting of one berth suitable for berthing of LLOYD TRIESTINO's vessel on arrival for a period of 36 hours each week for each separate weekly service operated by LLOYD TRIESTINO.  Such 36 hour Priority Berthing Period(s) will be declared by LLOYD TRIESTINO prior to commencement of operations under this Agreement subject to existing Priority Berthing Assignments. The Priority Berthing Period may be altered from time to time by mutual agreement provided that the revised Priority Berthing Period does not conflict with any other existing Priority Berthing Period in effect at the time that LLOYD TRIESTINO gives notice of it's intent to change its Assignment.

B.     Vessels arriving outside of the time of the Priority Berthing Period will be provided a berth on a "first available" basis, provided that any such berthing does not interfere with another carrier's Priority Berthing Period.

C.     MTC warrants that LLOYD TRIESTINO will always enjoy the benefit of a Berth Priority that is equal to or better than any other user of BENT.  If MTC grants better terms and conditions for a Berth Priority to another carrier calling BENT, MTC shall immediately make the same terms and conditions available to LLOYD TRIESTINO with the same effective date of the better terms and conditions offered to the other carrier.

#### 3.3   CRANE PRIORITY

A.     MTC will provide LLOYD TRIESTINO  with a fixed day of the week Priority Crane Assignment Period(s) each consisting of at least two gantry cranes for a period of 36 hours each week for each separate weekly service operated by LLOYD TRIESTINO.  Such 36 hour Priority Crane Assignment Period(s) will be declared by LLOYD TRIESTINO prior to commencement of operations under this Agreement subject to existing Priority Crane Assignments. The 36 hour Priority Crane Assignment may be altered by LLOYD TRIESTINO  by giving written notice to MTC which notice MTC is

obligated to accept provided that the revised Priority Crane Assignment Period does not conflict with any other existing Priority Crane Assignment in effect at the time that LLOYD TRIESTINO gives notice of it's intent to change it's Assignment.

B.      MTC warrants that LLOYD TRIESTINO will always enjoy the benefit of a Crane Priority that is equal to or better than any other user of the BENT. If MTC grants better terms and conditions for a Crane Priority to another carrier calling BENT, MTC shall immediately make the same terms and conditions available to LLOYD TRIESTINO with the same effective date of the better terms and conditions offered to the other carrier.

C.      Vessels arriving outside of the time of the Priority Crane Assignment  will be provided cranes on a "first available" basis, provided that any such assignment of cranes does not interfere with another carrier's Priority Crane Assignment.

Additional cranes will be provided to LLOYD TRIESTINO  on a "as available" basis.

3.4      STEVEDORING OPERATIONS

A.      MTC will provide stevedoring services on an around the clock basis if required by LLOYD TRIESTINO  and in accordance with PMA/ILWU agreements.

B.      MTC will plan unloading/loading sequence of containers in accordance with the inbound stowage sheet and the prestow instructions of LLOYD TRIESTINO, and prepare and furnish to LLOYD TRIESTINO appropriate container stowage plans.

C.      MTC will provide all stevedoring equipment required for handling of containers including gantry cranes, yard tractors, yard handling equipment and yard chassis. Equipment for handling non-containerized cargo will be provided as available and at rates specified in the Rates and Service schedule or as mutually agreed. MTC will be responsible for the maintenance and fueling of it's owned or operated equipment.

D.      MTC will discharge containers, as well as uncontainerized cargo, from vessels and move them to a point of rest in the yard, and move containers, as well as uncontainerized cargo, from a point of rest in the yard to vessels and load and stow containers/cargo onto vessels.

E.      MTC will lash or unlash containers stowed on or under deck of vessels and dog and undog hatch covers.

F.      MTC will open and close hatches.

G.      MTC will check and tally the movement of containers onto, off vessel and in shifting on board vessels and take damage exceptions where possible from visual inspections.

H.      MTC will collect lashing gear and store same in the gear box provided on board.

I. MTC will place containers on LLOYD TRIESTINO's or its client's chassis, if requested, segregate and make readily available for, and expeditious delivery of, containers destined to be on-carried by rail, or local "hot" containers. LLOYD TRIESTINO to advise MTC in advance of vessel's arrival, particulars of all such containers and make adequate chassis available.

J. MTC will advise working schedule of vessels and estimated time of completion of vessel operations and immediately advise of any changes.

K. MTC will order gangs and linemen for stevedoring operations in accordance with instructions received from LLOYD TRIESTINO.

L. MTC shall obtain LLOYD TRIESTINO's prior approval to ordering extra labor to be for the LLOYD TRIESTINO's account.

## 3.5 TERMINAL OPERATIONS

A. MTC will provide receiving and delivery services to LLOYD TRIESTINO Monday through Friday between 8 AM and 5 PM excluding holidays. Holidays, overtime or extended hours will be worked when so instructed by LLOYD TRIESTINO at rates as provided in the Rate Schedule.

B. Import containers will be discharged onto chassis. MTC will accomplish import locations within thirty (30) minutes of discharge and update MTC's computer system for availability by use of Mobile Data Terminal (MDT) technology.

C. Export containers will primarily be grounded. MTC may leave exports on wheels providing space and chassis are available. MTC will demount export containers from road transport on receipt at the Terminal.

D. MTC will weigh export containers.

E. MTC will verify seals numbers on all import and export gate moves.

F. MTC will verify and check hazardous cargo descriptions and labels on any hazardous export cargo and take necessary action to prevent noncompliance.

G. MTC will execute an interchange for each gate transaction and will retain a copy. MTC will provide a copy to LLOYD TRIESTINO if required.

H. MTC will provide all terminal equipment required for handling of containers including yard tractors, yard handling equipment and yard chassis. Equipment for handling non-containerized cargo will be provided as available and at rates specified in the Rates and Service schedule or as mutually agreed. MTC will be responsible for the maintenance and fueling of its owned or operated equipment.

I. MTC will provide sufficient storage area for LLOYD TRIESTINO's inbound and outbound loaded containers. LLOYD TRIESTINO will maintain an empty inventory not to exceed 2.5

times the weekly average export loadings for the previous three month period and MTC will discuss and inform LLOYD TRIESTINO of this suitable empty inventory level from time to time. Empty containers exceeding this level will be assessed a charge of $ 5.00 per TEU per day in accordance with the provisions of MTC's Management Agreement with the Port of Oakland.

J.    MTC will provide a designated individual to act as Customer Service coordinator between the Terminal and LLOYD TRIESTINO's customers.

K.    MTC shall maintain a 40 minute truck turn around time for any single gate transaction. This guarantee applies to trucks arriving between 8:00 AM and 4:00 PM and excludes lunch and coffee break times, providing that all documentation such as U.S. Customs entries and paid delivery orders are in order.   Any waiting time exceeding 40 minutes shall be paid by MTC, as long as the waiting time has been verified by the terminal staff at the time of the delay.

L.    MTC will comply with LLOYD TRIESTINO's instructions concerning container types for disposition or delivery to customers.

M.    MTC will provide security services for the facility and LLOYD TRIESTINO's cargo and equipment while on the facility and is responsible for any losses incurred as a result of security failures.

N.    MTC shall be responsible for the maintenance and repair of the Terminal including cleaning of offices.

O.    MTC shall be responsible for terminal utilities excluding electrical supply to refrigerated containers which will be invoiced in the relative rate for monitoring.

P.    MTC shall provide scales for weighing of containers.

Q.    MTC shall provide for up to three (3) physical inventories per year of containers and chassis at the Terminal at times to be selected by LLOYD TRIESTINO.  MTC will also provide additional physical inventories at any time at its expense in case of any significant error in MTC's inventory of containers and chassis when compared to LLOYD TRIESTINO's inventory of containers and chassis.

R.    MTC shall provide an adequate mechanic's inspection for all equipment received at the Terminal from truckers.

## 3.6   COMPUTER AND DOCUMENTATION SERVICES

A.    MTC will establish Electronic Data Interchange processes with LLOYD TRIESTINO's computer system in accordance with LLOYD TRIESTINO's requirements for timing and data content.

B.    MTC will process and retrieve AMS release data with U.S. Customs directly.

C.    MTC will prepare and provide to LLOYD TRIESTINO the following documentation:

EX. A,  PAGE 15

1.  Stowage plan and recapitulation sheet including dangerous cargo list, reefer list and oversize cargo listing.

2.  Daily ship and yard operation report showing the numbers of containers handled on any shift and other information requested by LLOYD TRIESTINO.

D.  MTC will prepare receiving and delivery information including interchanges, booking information and delivery release information.

E.  MTC will prepare daily yard inventories and other status reports on containers and chassis.

F.  MTC will arrange inquiry capabilities for major customers of LLOYD TRIESTINO who request this service.

G.  MTC will provide a "dial up availability" service for LLOYD TRIESTINO.

H.  MTC will provide LLOYD TRIESTINO with two CRT terminals and printers in LLOYD TRIESTINO's San Francisco office and one CRT in LLOYD TRIESTINO's terminal office.

I.  Rate of Computer Services: All data transmission and leased line set up costs to be paid by MTC.

## 3.7   REFRIGERATED CONTAINER SERVICES

A.  MTC will provide sufficient reefer spots and receptacles on the facility to accommodate LLOYD TRIESTINO's refrigerated containers

B.  MTC will monitor and provide records on refrigerated container temperature while on the Terminal and will promptly advise LLOYD TRIESTINO of any temperature discrepancies.

C.  MTC may provide refrigerated container maintenance services to LLOYD TRIESTINO. Services so provided will be separately contracted.

## 3.8   MAINTENANCE AND REPAIR SERVICES

A.  MTC may provide M & R services for LLOYD TRIESTINO's containers and chassis as required by LLOYD TRIESTINO. Services so provided will be separately contracted. LLOYD TRIESTINO is under no obligation to repair equipment at the Terminal and may utilize off terminal repair yards.

## SECTION 4       LLOYD TRIESTINO OBLIGATIONS

4.1   LLOYD TRIESTINO shall provide MTC all necessary information and instructions to allow MTC to provide efficient service, such as:

A.   Inbound

1. Stowage Plan (Sheets)
2. Reefer/dangerous cargo manifest
3. Cargo manifest information by EDI procedures
   with MTC's computer
4. Details of awkward containers and breakbulk
   cargoes.
5. Cargo freight release information

**SECTION 4        LLOYD TRIESTINO  OBLIGATIONS (CONTINUED)**

B.    Outbound

1. Booking information
2. Container release information
3. Written instructions regarding dangerous cargo
4. Outbound prestow after final close-out of
   bookings but well in advance of commencement
   of vessel operations.
5. Details of awkward containers and breakbulk
   cargo.

4.2    LLOYD TRIESTINO  shall ensure that the ship's gear and equipment is
       maintained in a safe condition and is in full compliance with all the
       requirements of United States Public Law 85-742 and OSHA
       regulations.

**SECTION 5        EXTRA WORK AND OVERTIME WORK**

When requested by LLOYD TRIESTINO, MTC shall perform extra work not
mentioned above and also overtime work outside the period covered by
service rates at terms and conditions contained in the rate schedule in
accordance with the PMA/ILWU and IAM agreements.

**SECTION 6        COMPENSATION**

6.1   PAYMENT

LLOYD TRIESTINO  agrees to compensate MTC at the rates specified in the
Rate and Service Schedule made a part of this Agreement. Payment shall be
made in U.S. funds, not later than forty five (45) days after receiving
relevant invoices together with supporting documents, excluding any amount
in dispute accompanied by a written explanation.

In the event that late payment occurs, and such late payment is due for more
than 60 days and such delayed payment is not the result of a dispute over
the correctness or accuracy of invoices, LLOYD TRIESTINO agrees to pay
interest on the outstanding sum at prevailing bank prime rates.

6.2   RATES

A.    The Rates for services provided under this Agreement are
      specified in the attached Rate and Service Schedule.
      Specific detail as to items included and excluded in each
      rate   is    identified   in    the    RECAP   OF    RATE

INCLUSIONS/EXCLUSIONS which is a part of this Agreement.

B.   MTC will not charge for any services under this Agreement not specifically identified as billable in the Rate and Service Schedule and the Recap of Items Included and Not Included in the Throughput Rate.

C.   If LLOYD TRIESTINO requires MTC to provide a service not covered by this Agreement LLOYD TRIESTINO and MTC will agree on terms and rates prior to commencing the work.

D.   Rates adjustments during the term of this Agreement including any extension thereof shall be accomplished in accordance with the Rate Adjustment Procedure which is incorporated in this Agreement.

## SECTION 7   SAFETY

7.1   Prior to commencing, during and until the completion of its work, MTC is allowed to inspect and determine the safety of any of vessel's gear and equipment which will be utilized in MTC's operations.

7.2   LLOYD TRIESTINO shall promptly notify MTC and MTC shall promptly notify LLOYD TRIESTINO of any property damaged and of any illness, injury or death of any person which is reported during MTC'S operations and each shall cooperate fully with the other in developing full and complete information about the facts and circumstances of the occurrence and the nature and extent of the damages or injuries which resulted therefrom.

7.3   All equipment supplied by MTC shall be in good working order and shall be in full compliance with all federal and state laws and all Port of Oakland regulations with regard to its safety and condition.

## SECTION 8   GENERAL TERMS AND CONDITIONS

8.1   DEFINITIONS

8.1.1

CARRIER as used herein includes the owners, charterers, managers, officers, agents and other representatives of the vessels for which the contemplated services are to be provided.

8.1.2

Unless MTC is advised to the contrary by CARRIER, MTC in the performance of its obligations hereunder, is entitled to rely on the instructions, representations and directions given by CARRIER's designated agent or employee(s) of the CARRIER at the port(s) where the services are to be rendered.

8.1.3

MTC as used herein refers to Marine Terminals Corporation, a Nevada corporation, and includes any and all subcontractors MTC may, in its sole discretion, determine to be necessary and appropriate to hire to perform any of its duties, responsibilities or obligations hereunder.

8.2 **CONTRACTOR'S LIABILITY**

8.2.1

Subject to the provisions of this Article, MTC will be legally liable for damage and loss of use to CARRIER's vessels , their equipment and appurtenances, as well as to containers and chassis, to the extent caused by the negligence of MTC, including it's employees, subcontractors or agents.

MTC will also be legally liable for loss of or physical damage to cargo, including loss of cargo overside, to the extent caused by the negligence of MTC, including it's employees, subcontractors or agents. The liability of MTC to CARRIER for cargo loss or damage shall in all cases, including any indemnification claim, be limited to claims for loss of or physical damage to cargo but in no event shall include any indirect or consequential damages to cargo, including without limitation, any loss of profits.

8.2.2 HIMALAYA EXTENSION

(a) With regard to any and all bills of lading or other contracts of affreightment evidencing agreements entered into for the transportation of cargo for which MTC's services are employed as stevedore and/or terminal operator, CARRIER shall incorporate therein a provision extending to MTC and its subcontractors and all benefits and limitations on liability of CARRIER thereunder, including without limitation, the provisions of the U.S. Carriage of Goods by Sea Act ("COGSA") and any similar foreign legislation or international convention and any other benefits or limitations on liability of CARRIER under such bill of lading or contract. Such extension of benefits shall cover any and all cargo to be handled by MTC under this Agreement.

(b) MTC has reviewed CARRIER's current bill of lading which is attached to this Agreement as Attachment # 1. MTC agrees that this bill of lading satisfies the requirements of Article 8.2.2 (a). CARRIER will promptly provide MTC with a copy of any revised version of this Bill of Lading.

8.2.3

CARRIER will use reasonable best efforts to provide prior written notice to MTC whenever CARRIER extends the time within which to file a claim or bring suit concerning a cargo loss or damage claim which CARRIER is seeking recovery from MTC.

8.2.4

CARRIER agrees that in no event shall MTC's liability for cargo loss or damage exceed that of CARRIER's to cargo.

## 8.3 INSURANCE

MTC shall maintain insurance during the term of this Agreement as follows:

### 8.3.1

Workers' Compensation Insurance for the protection of its employees in accordance with the California Compensation Act and the Federal Longshoremen and Harbor Workers' Act.

### 8.3.2

Bodily Injury Public Liability Insurance in an amount of ONE MILLION DOLLARS ($1,000,000) in respect of any one person and ONE AND A HALF MILLION DOLLARS ($1,500,000) with respect to any one occurrence as protection against injury to or death of any person or persons arising out of the negligence of MTC.

### 8.3.3

Property Damage Insurance in the amount of FIVE MILLION DOLLARS ($5,000,000) with respect to any one occurrence covering MTC's legal liability as protection against loss or damage to property arising out of the negligence of MTC under this Agreement.

### 8.3.4

Excess Public Liability and Property Damage Liability Insurance covering all operations in a combined single limit of FIVE MILLION DOLLARS ($5,000,000) in addition to the primary policies.

## 8.4 LABOR

MTC will provide sufficient labor for the performance of the services herein contemplated in accordance with prevailing Collective Bargaining Agreement(s), but always contingent upon labor being available to MTC. MTC shall not be responsible for any loss, damage, delay or non-performance whatsoever arising from strikes, lockouts, union disputes, deliberate work slowdown or stoppage or other labor difficulties or from picketing or other civil disturbance of any kind or any other non-availability of labor beyond the control of MTC.

## 8.5 FINE AND PENALTIES

CARRIER shall defend, indemnify and hold MTC harmless from any and all liability for any fines, penalties or other liabilities resulting from CARRIER's failure to properly label, placard, manifest, declare true cargo weight(s) or otherwise document any cargo, whether hazardous or otherwise regulated in the circumstances that MTC has no way to correct the mistakes.

LT at BENT.doc                Page 10 of 16                05/10/01

### 8.6 PAYMENT

#### 8.6.1

CARRIER shall at no time deduct any amount from MTC's invoices for claimed damages or offsets without the prior written consent of MTC.

### 8.7 FORCE MAJEURE

To the extent performance of the services identified in this Agreement is prevented for any reason beyond the control of the parties to this Agreement, including but not limited to, strikes, lockouts, labor disturbances or stoppages, or a concerted work slowdown by longshoremen, any disruption in electrical power supply, curtailment of fuel supply, acts of God, casualty, picketing or other acts of civil disturbance, acts of governmental authority or severe storm, such performance shall be excused. The party whose performance is so prevented shall give prompt written notice of the intent to rely on the provisions of this Article.

### 8.8 CONFIDENTIALITY

CARRIER and MTC shall preserve the confidentiality of any and all rate schedules which are a part hereof as well as any documents in connection with the business of either.

### 8.9 INDEPENDENT CONTRACTOR

MTC shall at all times be an independent contractor or subcontractor of CARRIER and not the agent or employee of CARRIER. The services identified in this Agreement shall be performed under the supervision of MTC subject to the overall supervision and authority of the vessel master with respect to the management of the vessel and any use to the vessel's on-board cargo handling gear.

### 8.10 ARBITRATION

In the event of any dispute between the parties arising out of the performance or interpretation of the Agreement which cannot be settled by negotiation within thirty (30) days, such matter shall be referred to arbitration under the rules then in effect of the American Arbitration Association as may be supplemented by the discovery provisions of the Federal Rules of Civil Procedure.

### 8.11 MISCELLANEOUS

#### 8.11.1

Either party may terminate this Agreement in the event of the filing of any voluntary petition in bankruptcy by the other party or the filing of any involuntary petition in bankruptcy by the other party's creditors, without notice.

#### 8.11.2

In the event of a failure by either party to perform according to the provisions of this Agreement, the party alleging such failure to

perform shall give the other party prompt written notice of any such
alleged failures. The party receiving such notice shall have ninety
(90) days from receipt of the notice to cure such alleged failure to
perform or demonstrate why a failure to perform does not exist. If
such failure to perform is not remedied in ninety (90) days, the
party alleging the failure may terminate this Agreement by notice in
writing. Any disputes arising under this section will be referred to
arbitration in accordance with Article 8.10.

8.11.3

All written notices given under this Agreement shall be given to the
intended recipient at its address as set forth below or such other
address as it may designate in writing from time to time:

TO:    MARINE TERMINALS CORPORATION
       600 Harrison St., Ste. 200
       San Francisco, CA 94107

TO:    LLOYD TRIESTINO di NAVIGAZIONE S.P.A.
       Passeggio S. Andre, 4
       34123 Trieste - Italy

8.11.4

This Agreement shall be construed, interpreted and enforced in
accordance with the laws of the State of California, without
reference to the laws of any other jurisdiction, except to the extent
that the laws, rules and regulations of the United States of America
shall apply.

8.11.5

Captions at the beginning of each Article are intended for
convenience of reference only and shall not affect the interpretation
or construction of this Agreement.

8.11.6

No waiver by CARRIER or MTC of any of the covenants or
conditions of this Agreement shall be deemed as a waiver with
respect to performance or occurrence of any other covenants or
conditions except made in writing.

8.11.7

The individuals executing this Agreement represent and warrant that
they are authorized to bind the party on whose behalf they are
executing this Agreement to the terms and conditions hereof.

8.11.8

This document incorporates all terms, agreements, understandings
and representations of the parties and supersedes any other
agreements, discussions, representations or understandings of the
parties hereto.

EX. A, PAGE 22

### 8.11.9

This Agreement may be executed in two (2) counterpart originals, each of which shall be deemed to be an original when executed and delivered, and all of which shall be deemed to be one instrument.

### 8.11.10

Termination of this Agreement shall not affect or relieve either party of its liability or obligation that may have occurred on and/or before the termination date.

## SECTION 9  ASSIGNMENT

No party to this Agreement may assign or transfer this Agreement or all or any part of its rights or duties hereunder to any person, firm or corporation without the prior written consent of the other parties.

## SECTION 10 SUBCONTRACTING

MTC shall not subcontract performance of its rights and duties specified in this Agreement without the prior written consent of LLOYD TRIESTINO , which consent shall not be unreasonably withheld.

## SECTION 11 MODIFICATIONS

This Agreement may be amended, modified or supplemented at any time by mutual consent expressed in writing by the parties hereto.

## SECTION 12 PARTIAL INVALIDITY

If any provision of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions shall nevertheless continue in force without being impaired or invalidated in any way.

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be duly executed by their respective representative thereto duly authorized, on the date and year first above written, in two originals.

LLOYD TRIESTINO di NAVIGAZIONE SPA       MARINE TERMINALS CORPORATION

By: _____       By: _____

Title: _____       Title: DOUGLAS A. TILDEN
                                            PRESIDENT + CEO

LT at BENT.doc                    Page 13 of 16                    05/10/01

EX. A,  PAGE 23

**LLOYD TRIESTINO di NAVIGAZIONE SPA**
**OAKLAND**

**THROUGHPUT RATE ADJUSTMENT PROCEDURE**

### RATE ADJUSTMENTS

The Stevedore and Terminal rates contained in the Rate and Service Schedule will remain valid through June 30, 2001. They then will be adjusted for the following changes in costs only:

1.    Rates will be adjusted to reflect changes in wage rates, man-hour assessments, insurance and taxes as per this Rate Adjustment Procedure.

2.    A change in the Port of Oakland tariff crane charges

### RATE ADJUSTMENT PROCEDURE:

1.    The Throughput and Accessorial Rates as well as Gang-hour and Man-hour Rates will be adjusted annually on the same date as the commencement of the ILWU/PMA contract year to reflect changes in ILWU wages, the Man-Hour Assessment rate and the Port of Oakland crane rate only. The ILWU/PMA contract year commences at 0800 on the first Saturday of each July. The Throughput and Accessorial Rates will be adjusted as detailed below. The Gang-hour and Man-hour Rates would be calculated based on the actual changes in assessments.

2.    COST ADJUSTMENT

The Throughput and Accessorial Rates will be adjusted based on a Cost Adjustment calculated from the final Man-Hour Assessment rate agreed between the ILWU and the PMA for the each contract year and any increase in the Port of Oakland crane rate. These rate adjustments will be applied to the Throughput and Accessorial rates in effect at that time in accordance with the Cost Index in the following formula:

Percent labor cost increase X 70% + crane rate increase

---

**LLOYD TRIESTINO di NAVIGAZIONE SPA**
**OAKLAND**
**THROUGHPUT RATE ADJUSTMENT PROCEDURE**

---

3.   **LABOR COST INCREASE**

The percentage of labor cost change will be calculated by comparing the straight time labor cost for a basic longshoreman in effect at the start of each ILWU contract year with the cost in effect in the previous contract year. The 2000/01 labor cost is:

| | |
|---|---|
| Base Wage: | $27.18 |
| Man-hour Assessment: | 12.26 |
| Insurance and taxes: (50.43% of wage) | 13.71 |
| | -------- |
| **Total** | **$53.15** |

The 70 % factor represents the percentage of the throughput rate that consists of labor expense including ILWU, IAM, and administrative labor.

4.   **CRANE RATE COST INCREASE**

The crane rate cost increase would be calculated by dividing the hourly crane rate increase by 27.5 containers per hour.

5.   **EXAMPLE of COST ADJUSTMENT CALCULATION**

An example of how the calculation would function is as follows assuming a $0.50 increase in wages, a $0.47 increase in the Man-Hour assessments and a $25.00 increase in the Port Crane Rental Rates on July 1, 2001:

STEP 1:   **CALCULATE LABOR COST INCREASE:**

| | OLD | NEW |
|---|---|---|
| Wage: | 27.18 | 27.68 |
| Assessment: | 12.26 | 12.73 |
| Insurance and taxes: (50.43% of wage) | 13.71 | 13.96 |
| | -------- | ------- |
| Total | 53.15 | 54.37 |

| | |
|---|---|
| Labor cost increase: | $ 54.37 - $53.15 = $ 1.22 |
| Percent increase: | $ 1.22 / $53.15 = 2.30% |

STEP 2:   **CALCULATE LABOR INCREASE PERCENT:**

| Labor cost increase | X .70 % | = | Rate Increase Percent |
|---|---|---|---|
| 2.30 % | X .70 | = | 1.61 % |

---

### LLOYD TRIESTINO di NAVIGAZIONE SPA
### OAKLAND

### THROUGHPUT RATE ADJUSTMENT PROCEDURE

---

STEP 3:     CALCULATE RATE INCREASE FROM LABOR:

Throughput Rate     X Rate Incr. %  =  LABOR RATE INCREASE

$ 173.30            X 1.61 %           = $2.79

STEP 4:     CALCULATE CRANE RATE INCREASE:

Crane Increase      / Moves/Hr   =  Crane Rate Increase

$ 25.00             / 27.5       = 0.91

STEP 5:     CALCULATE NEW THROUGHPUT RATE

| Old Throughput Rate: | 173.30 |
| Labor Rate Increase: | 2.79 |
| Crane Rate Increase: | 0.91 |
| New Throughput Rate | 177.00 |

This procedure would also be applied to all accessorial rates in the agreement which are quoted on a "per unit" basis.

## RATE ADJUSTMENT PROCEDURE – M&R RATES:

1.      The M&R will be adjusted annually on the same date as the Throuput Rate above. The M&R Unit Rates will be adjusted based on the cost adjustment procedures as detailed above, except that IAM Man Hour costs and an 80% factor will be used. The M&R Man-hour Rates would be calculated based on the actual changes in IAM wages, benefits and insurance and taxes.

EX. A,  PAGE 26

## LLOYD TRIESTINO di NAVIGAZIONE SPA
## OAKLAND, CA.

### RATE AND SERVICE SCHEDULE

**1.0 CONTAINER THROUGHPUT AND ACCESSORIAL RATES**

7/1/00 TO 6/30/01

THROUGHPUT RATE: POST PANMAX CRANE
Per container discharged or loaded
(full/empty)

VOLUME DISCOUNT: Per Throughput full or empty
container handled in excess of 30,000
throughput moves per contract year:

EMPTY DISCOUNT:

Effective for all services after termination of
SPW service:

RESTOWS: Each Container Restowed

A.1) Cell to Cell
A.2) Cell to Dock to Cell

OVERHEIGHT/OVERWIDTH/DAMAGED
surcharge each container (1)

YACHTS AND BREAKBULK CARGO                Extra Labor Rates

(1) Damaged, overheight, and overwidth containers which can be handled by regular crane spreader
alone, will be handled at the prevailing throughput rate. Damaged, overheight, and overwidth
containers which can be handled by lifting from the four corner castings with emergency gear will be
handled at the overheight/overwidth prevailing rate. Damaged, overheight and overwidth containers
which cannot be handled by either of the above methods will be handled on an extra labor basis,
plus equipment.

---

## LLOYD TRIESTINO di NAVIGAZIONE SPA
### OAKLAND, CA.

### RATE AND SERVICE SCHEDULE

---

### ACCESSORIAL RATES

Grounding and mounting of Eastbound Loads:
(per container grounded)
Subject to chassis availability and prior approval
of LLOYD TRIESTINO

General cargo, receive/deliver

Gang hour Rates

Man Hour Rates

### REEFER SERVICES

Reefer plugging/unplugging

Reefer monitoring (including power)

Reefer Pretrip

Reefer Washout

Reefer Steam Clean

Reefer Calibration

Gen Set Calibration

Chassis Quarterly BIT Inspection

Other Maintenance Services

### FIRST SHIFT S.T.

Per R/T

AS PER ATTACHED SCHEDULE

AS PER ATTACHED SCHEDULE



Per Attached Mechanic
Man-Hour Rates

EX. A, PAGE 28

---

### LLOYD TRIESTINO di NAVIGAZIONE SPA
### OAKLAND, CA.

#### RATE AND SERVICE SCHEDULE

---

## 2.0 RECAP OF ITEMS INCLUDED AND NOT INCLUDED IN THE <u>THROUGHPUT</u> RATE

| | INCLUDED<br>(MARKED YES) | NOT<br>INCLUDED<br>(MARKED NO) |
|---|---|---|
| **2.1 STEVEDORING:** | | |
| **PERSONNEL & EQUIPMENT** | | |
| Longshore labor ......................................... | YES | |
| Clerks' labor............................................... | YES | |
| Overtime differentials:.................................. | YES | |
| Supervision................................................. | YES | |
| CONTRACTOR'S equipment........................ | YES | |
| Portainer (container crane) ........................... | YES | |
| **DETENTIONS** | | |
| Standby for vessel ...................................... | YES | |
| Standby for weather..................................... | YES | |
| Standby for Contractor's equipment ............. | YES | |
| Standby for gangs to fill .............................. | YES | |
| Standby labor disputes ................................ | YES | |
| Standby for vessel gear ............................... | YES | |
| Standby change in stow or operation ........... | | NO |
| Standby awaiting cargo ................................ | | NO |
| Standby/detention for "safety"<br>lashing aloft.............................................. | YES | |
| Delays due to damaged, frozen or<br>improperly installed cones .......................... | YES | |
| Guarantee time (to fill out a shift)................... | YES | |
| | | |
| **ACTIVITIES: LOADING/DISCHARGING** | | |
| Handling standard ISO containers:............... | YES | |
| Grounding during vessel operations: | | |
| Westbounds Loads ........................... | YES | |
| Empty containers .............................. | YES | |
| Eastbound loads ............................... | | NO (1) |
| Overheight/overwidth/damaged<br>containers............................................... | | NO (1) (2) |
| Uncovering/covering hatches provided<br>hatch covers are within capacity of<br>container crane......................................... | YES | |

NOTE (1): See rate schedule for specific charge.
NOTE (2): If these containers can be handled with the regular equipment in use for standard containers without any additional manpower or equipment, then there is no extra charge. If extra equipment or manpower is required then they will be handled on an extra labor basis with equipment rental as required.

---

---

**LLOYD TRIESTINO di NAVIGAZIONE SPA**
**OAKLAND, CA.**

**RATE AND SERVICE SCHEDULE**

---

## 2.0 RECAP OF ITEMS INCLUDED AND NOT INCLUDED IN THE <u>THROUGHPUT</u> RATE

| | INCLUDED (MARKED YES) | NOT INCLUDED (MARKED NO) |
|---|---|---|
| **2.1 STEVEDORING: (continued)** | | |
| Chassis ..................................................... | | NO |
| General cargo ............................................ | | NO (1) |
| Lashing/unlashing containers ...................... | YES | |
| Lashing/unlashing other cargoes ................. | | NO |
| Discharging loose cargo from | | |
| damaged containers aboard | | |
| vessels or on the dock............................. | | NO |
| Plugging/unplugging reefers aboard vessel.. | | NO |
| **2.2 TERMINAL OPERATIONS** | | |
| <u>PERSONNEL & EQUIPMENT</u> | | |
| Longshore labor S.T. ................................... | YES | |
| Clerks' labor S.T. ....................................... | YES | |
| Supervision ................................................ | YES | |
| Equipment................................................... | YES | |
| | | |
| <u>ACTIVITIES</u> | | |
| Receiving & delivery of containers | | |
| - Mon.-Fri. (excluding hol.) 8AM - 5PM | YES | |
| - Sat, Sun, Holiday, Nights, | | |
| Extended day shift.................................... | | NO |
| Mounting & dismounting from road transport S.T: | | |
| Westbound Loads ............................... | YES | |
| Empty containers ............................... | YES | |
| Eastbound loads ................................ | | NO (1) |
| Basic computer services .............................. | YES | |
| Planning of yard and vessel | | |
| operations including stowage plans.......... | YES | |
| Physical inventories of equipment | | |
| (3 times per year) ..................................... | YES | |
| Gate moves for receiving | | |
| domestic empties....................................... | YES | |
| Other gate moves not part of | | |
| throughput transaction.............................. | YES | |
| Inspection at Gate by Mechanic | | |
| of incoming equipment ............................. | YES | |
| Maintenance and repair of client's | | |
| equipment................................................. | | NO |
| Security of Terminal ..................................... | YES | |
| Yard rehandles for survey, inspection, repair | YES | |
| Plugging/unplugging reefers ........................ | | NO (1) |
| Monitoring reefer containers ........................ | | NO (1) |
| Housekeeping/sweeping of terminal ............. | YES | |

```
┌─────────────────────────────────────────────────────┐
│        LLOYD TRIESTINO di NAVIGAZIONE SPA            │
│                   OAKLAND, CA.                       │
│                                                      │
│              RATE AND SERVICE SCHEDULE               │
└─────────────────────────────────────────────────────┘
```

## 2.0 RECAP OF ITEMS INCLUDED AND NOT INCLUDED IN THE THROUGHPUT RATE

| 2.2 TERMINAL OPERATIONS (CONT.) | INCLUDED (MARKED YES) | NOT INCLUDED (MARKED NO) |
|---|---|---|
| Preparation of EIR and remark on | | |
| damages | YES | |
| Weight export containers | YES | |
| Verify seal numbers | YES | |
| Verify hazardous cargo labeling and | | |
| making corrections if necessary | YES | |
| Stacking/unstacking chassis | YES | |

## 2.3 OTHER OPERATING COSTS

COSTS

| | INCLUDED (MARKED YES) | NOT INCLUDED (MARKED NO) |
|---|---|---|
| Insurance & taxes | YES | |
| PMA man-hour assessments | YES | |
| Lap time for key personnel | YES | |
| Time in Lieu claims against vessel | | NO |
| Cargo Penalties | | NO |
| Travel time where applicable (for | | |
| longshoremen and clerks) | YES | |
| Fuel and electricity | YES | |
| Overtime Differential - | | |
| Yard Operations | | NO |
| Demurrage | | NO |
| Wharfage | | NO |
| Dockage | | NO |
| Storage | | NO |
| Lines, tugs, and pilots | | NO |
| PMA tonnage assessments | | NO |

NOTE (1):    See rate schedule for specific charge.

**LLOYD TRIESTINO di NAVIGAZIONE SPA**
**OAKLAND, CA.**

**RATE AND SERVICE SCHEDULE**

**3.0    EQUIPMENT RENTAL RATES**          **7/1/00 to 6/30/01**

FORK LIFTS

    Five ton ..........................................................
    Electric ..........................................................
    Electric with attachment.................................
    Ten ton...........................................................
    Fifteen ton......................................................
    Twenty-five ton ..............................................
    Twenty-five ton with attachment ...................
    Thirty to thirty-five ton with
        expandable spreader.................................

OTHER EQUIPMENT

    Sidepicker.....................................................
    Yard hustler ..................................................
    Tophandler.....................................................
    Transtainer.....................................................

EX. A,  PAGE 32

---

### LLOYD TRIESTINO di NAVIGAZIONE SPA
### OAKLAND, CA.

### RATE AND SERVICE SCHEDULE

---

**4.0 GANG HOUR BILLING RATES**                    7/1/00 to 6/30/01
    Including guarantee cost and travel time

**STANDBY AND DETENTION**

    Monday - Friday  1st Shift

    Monday - Friday  2nd Shift

    Weekend/Holidays 1st/2nd

    Monday - Friday  3rd Shift

    Weekend/Holidays 3rd Shift



**EXTRA LABOR**

    Monday - Friday  1st Shift

    Monday - Friday  2nd Shift

    Weekend/Holidays 1st/2nd

    Monday - Friday  3rd Shift

    Weekend/Holidays 3rd Shift



Note:    Rates contained in this rate and service schedule are based on PMA Man-hour Assessments of ▓▓▓▓ per hour (401k plan adjustment). There may be additional adjustments to Man-hour Assessment for increased benefit costs. Such a change would result in additional rate adjustments.

EX. A, PAGE 33

## LLOYD TRIESTINO di NAVIGAZIONE SPA
### OAKLAND, CA.

## RATE AND SERVICE SCHEDULE

### 5.0   MAN-HOUR BILLING RATES
(including guarantee cost and travel time)

7/1/00 to 6/30/01

| CLASSIFICATION | LAP HRS | RATE | 1ST SHIFT DETENTION | 1ST SHIFT EXTRA LABOR | 2ND SHIFT DIFF. | 1st & 2nd OT DIFF. | 2ND SHIFT WEEK DAY DIFF. | 3RD SHIFT WEEK END DIFF. |
|---|---|---|---|---|---|---|---|---|
| Lasher | | Basic | | | | | | |
| Tractor Driver | | Class I | | | | | | |
| Lift Truck Operator | | Class I | | | | | | |
| Lift Truck – Heavy | | Class II | | | | | | |
| Tophandlier/Sidepick | 8/1 | Class II | | | | | | |
| Crane Operator | 8/1 | Class II | | | | | | |
| 30% Foreman | 8/2 | | | | | | | |
| Basic Clerk | | Basic | | | | | | |
| 15% Supervisor | 8/2 | 15.00% | | | | | | |
| 25% Clerk – Computer | 8/2 | 25.00% | | | | | | |
| Supercargo | 8/2 | 30.00% | | | | | | |
| 30% Chief Supervisor | 8/2 | 30.00% | | | | | | |
| Gearman | 8/1 | | | | | | | |
| Superintendent | | | | | | | | |
| Watchman | | | | | | | | |
| Lead Linesman | | | | | | | | |
| Linesman | | | | | | | | |
| Mechanic | | | | | | | | |



# EXHIBIT B

# MARINE TERMINALS CORPORATION

2001 JOHN S. GIBSON BOULEVARD, 2ND FLOOR  •  SAN PEDRO, CALIFORNIA 90731

PHONE (310) 519-2300  •  FAX (310) 732-5500

*Contracting Stevedores & Terminal Operators*

February 12, 2004

Lloyd Triestino di Navigazione SPA
Passeggio S. Andrea,
4-34123 Trieste,
Italy

**Re:** *Assignment of Agreement for Stevedoring and Terminal Services – Oakland.*

Gentlemen,

As of May 1, 2002, the Oakland 7th Street, Ben E. Nutter, Terminal has been preferentially assigned to Evergreen Marine Corp. (Taiwan) Ltd. (EMC). In accordance with Article 9 of the Agreement for Stevedoring and Terminal Services dated May 15, 2001, we request consent to the assignment of the Agreement to Seaside Transportation Services LLC, effective August 2, 2003.  All of the terms, conditions and rights of the agreement will then be between Lloyd Triestino di Navigazione SPA and Seaside Transportation Services LLC.

Please indicate Lloyd Triestino di Navigazione SPA's agreement to the assignment and return for our files.

Thank you.

Yours sincerely,
MARINE TERMINALS CORP.

Walter Romanowski
Executive Vice President
Container Operations

Consent and agreement:
LLOYD TRIESTINO di NAVIGAZIONE SPA

„LLOYD TRIESTINO"
DI NAVIGAZIONE-SOCIETA' PER AZIONI-SEDE IN TRIESTE

Title:

Maurizio Salce
Executive Vice President

Date: _____

SEASIDE TRANSPORTATION
SERVICES LLC

Edward Horng
President

# ORIGINAL

---

**AMENDMENT NO. 1 TO**
**AGREEMENT FOR STEVEDORING AND TERMINAL SERVICES**
**BETWEEN**
**LLOYD TRIESTINO di NAVIGAZIONE SPA**
**AND**
**MARINE TERMINALS CORPORATION**

---

This AMENDMENT No. 1 is made and entered into on August 2, 2003 between LLOYD TRIESTINO di NAVIGAZIONE SPA (hereinafter referred to as LT or CARRIER), and Marine Terminals Corporation (hereinafter called MTC or CONTRACTOR).

### WITNESSETH

**WHEREAS, LT** and MTC have entered into an agreement dated May 15, 2001 for services at the 7th St. Marine Terminal in the Port of Oakland, CA. (hereinafter referred to as Terminal); therefore,

LT and MTC agree to amend the Agreement for Stevedoring and Terminal Services entered into on May 15, 2001 as follows:

SECTION 2          Replace in its entirety to read,
"This Agreement shall be effective on August 2, 2003 and continue in full force and effect one (1) year unless either party give the other party a ninety (90) days prior written notice to terminate this Agreement."

SECTION 3.1.B      Replace in its entirety to read,
"MTC shall perform all services in accordance with the ILWU/PMA collective bargaining agreement, labor agreement with the IAM and the customs and practices of the Port."

SECTION 3.3        Deleted in its entirety.

SECTION 3.5.I      Deleted in its entirety.

SECTION 3.6.H      Replace in its entirety to read,
"MTC will provide web based inquiry access to LT's data at the Terminal."

EX. B, PAGE 36

SECTION 8.2.1   Amend first paragraph to read,
"Subject to the provisions of this Article, MTC will be legally liable for damage and loss of use to CARRIER's vessels, their equipment, their facilities and appurtenance, containers and/or chassis, to the extent caused by the negligence of MTC, including its employees, subcontractors or agents."

SECTION 8.3.5   Add this new Section 8.3.5,
"Upon request, MTC will furnish LT with certificates of insurance evidencing such coverage. Such request or absence of such a request shall in no way be constructed as waiving MTC's obligations to arrange insurance required by law or by this Agreement.   All insurance policies for such coverage shall expressly provide that they shall be non-cancelable and shall not be canceled whether for non-payment of premiums or any other cause unless LT shall be given thirty (30) days advance written notice by the issuers or MTC, said notice to be given by certified mail to LT at its last know address."

SECTION 8.6.1   Amend by adding the following sentence to the end of the paragraph,
"However, any settled payment of claimed damages shall be paid by the defaulting party within 15 days to the other from the date settlement is reached for the claimed damages by the parties."

SECTION 8.11.1  Replace in its entirety to read,
"Either party may terminate this Agreement in the event of the filing of any voluntary petition in bankruptcy by the other party or the filing of any involuntary petition in bankruptcy by the other party's creditors, with written notice to the other party."

SECTION 8.11.2  Replace in its entirety to read,
"In the event of a failure by either party to perform according to the provisions of this Agreement, the party alleging such failure to perform shall give the other party prompt written notice of any such alleged failures.  The party receiving such notice shall have thirty (30) days from receipt of the notice to cure such alleged failure to perform or demonstrate why a failure to perform does not exist.  If such failure to perform is not remedied in thirty (30) days, the party alleging the failure may terminate this Agreement by notice in writing. Any disputes arising under this section will be referred to arbitration in accordance with Article 8.10."

SECTION 8.11.3    Changes and Additions to Addresses as follows:
                  To:    MARINE TERMINALS CORPORATION
                         1999 HARRISON STREET, SUITE 550
                         OAKLAND, CA. 94612

                  TO:    LLOYD TRIESTINO di NAVIGAZIONE S.P.A.
                         Passeggio S. Andre, 4
                         34123 Trieste – Italy

                  TO:    SEASIDE TRANSPORTATION SERVICES, LLC
                         389 Terminal Way
                         Terminal Island, CA 90731

RATE and SERVICE SCHEDULE and RATE ADJUSTMENT PROCEDURE
The THROUGHPUT RATE ADJUSTMENT PROCEDURE has been replaced in its
entirety by Rate Schedule #1, effective August 2, 2003, and has been executed
separately.

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be duly
executed by their respective representative thereto duly authorized, in two originals.

LLOYD TRIESTINO di NAVIGAZIONE SPA

„LLOYD TRIESTINO"
By: _____ DI NAVIGAZIONE-SOCIETA PER AZIONI-SEDE IN TRIESTE

Title: _____
                  Maurizio Salce
Date: _____ Executive Vice President

MARINE TERMINALS CORPORATION

By: _____

Title: EXECUTIVE U.P. CONTAINER OPERATIONS

Date: 02/12/04

SEASIDE TRANSPORTATION SERVICES, LLC

By: Edward Henry

Title: President

Date: 02/12/0 X

EX. B, PAGE 38